IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

**SHAN L. ZIRLOTT,**
     **Plaintiff,**

**v.**                                    **Case No. 5:10cv164/SPM/CJK**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**
     **Defendant**.

_____

## REPORT AND RECOMMENDATION

This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Northern District of Florida Local Rules 72.1(A), 72.2(D), and 72.3, relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. § 401, *et seq*. The case is now before the court pursuant to 42 U.S.C. § 405(g), for review of a final determination of the Commissioner of Social Security ("Commissioner") denying claimant's continuing eligibility for disability insurance benefits under Title II of the Act, 42 U.S.C. §§ 401-34, and supplemental security income ("SSI") under Title XVI of the Act, 42 U.S.C. §§ 1381-83.

Upon review of the record before this court, I conclude that the findings of fact and determinations of the Commissioner are supported by substantial evidence. The decision of the Commissioner therefore should be affirmed.

PROCEDURAL HISTORY

On August 23, 2000, Shan L. Zirlott (who will be referred to by name, as plaintiff, or as claimant) protectively filed applications for disability insurance benefits and SSI, alleging disability beginning August 15, 1999.   Claimant's applications were denied initially and on reconsideration. T. 49.[1]  In a decision dated May 1, 2002, an administrative law judge ("ALJ") found plaintiff disabled beginning April 5, 2000.  T. 49-52.  On November 3, 2004, however, the ALJ issued a decision in which he found claimant's disability to have ended beginning November 1, 2004. T. 55-56.  Following a hearing, a state agency disability hearing officer upheld that determination on December 21, 2005.  T 142-45.  Claimant filed a timely written request for a hearing before an ALJ, which occurred May 8, 2008.  The ALJ issued an unfavorable decision, finding plaintiff's disability had ended on November 1, 2004, and that she had not become disabled again since that date.  T. 34.  On April 27, 2010, the Appeals Council denied plaintiff's request for review.  T. 10-12.  The ALJ's decision thus stands as the final decision of the Commissioner and is now subject to review in this court pursuant to section 1383(c) of the Act.

## FINDINGS OF THE ALJ

In his written decision the ALJ made several findings relative to the issues raised in this appeal:

1.  The most recent favorable medical decision finding that claimant was disabled is the decision dated May 1, 2002.  This is known as the "comparison point decision" ("CPD").

---

[1] The administrative record, as filed by the Commissioner, consists of eight volumes (doc. 12 through 12-7), and has 1,257 consecutively numbered pages.  References to the record will be by "T." for transcript, followed by the page number.

2.  At the time of the CPD, claimant had the following medically determinable impairments: history of chronic renal failure, hearing loss, major depressive disorder, and post-traumatic stress disorder ("PTSD").  Claimant's chronic renal failure was found to meet section 6.02(B) of 20 C.F.R. Part 404, Subpart P, Appendix 1.

3.  The medical evidence establishes that, as of November 1, 2004, claimant had the following medically determinable impairments:  status-post renal transplant, gastroparesis, hearing loss, flat feet, and mild depressive disorder.  These are claimant's current medical impairments.

4.  Since November 1, 2004, claimant has not had an impairment or combination of impairments that meets or medically equals the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.  Medical improvement occurred as of November 1, 2004.  The medical evidence supports a finding that as of November 1, 2004, there had been a decrease in medical severity of the impairments present at the time of the CPD.  The medical improvement is related to the ability to work because, as of November 1, 2004, claimant's CPD impairments no longer met or medically equaled the same listing(s) met at the time of the CPD.

6.  Beginning November 1, 2004, claimant has continued to have a severe impairment or combination of impairments.  Based on the current impairments, claimant has had the residual functional capacity to perform light work as defined in 20 C.F.R. § 416.967(b), except that, in an eight-hour work day, she can stand and walk for up to four hours with a sit/stand option, due to a history of flat feet.  Sitting is not affected and claimant can sit at least six hours in an eight-hour work day.  Claimant can lift, carry, push, and pull 20 pounds occasionally and ten pounds or less

frequently.  Due to hearing deficits and her previously impaired renal function, claimant should avoid work in proximity to loud environments, as well as work settings that are very hot or humid.  Claimant is able to perform postural activities on a frequent basis and has no manipulative difficulties.  Claimant is limited to unskilled work due to her credible mental deficits.

7.  Beginning November 1, 2004, claimant has been unable to perform any of her past relevant work.  On November 1, 2004, claimant was a younger individual age 18-49.  Claimant has at least a high school education and is able to communicate in English.

8.  Beginning November 1, 2004, transferability of job skills is not material to the determination of disability, because using the Medicaid-Vocational Rules as a framework supports a finding that claimant is "not disabled," regardless of whether claimant has transferable job skills.

9.  Beginning November 1, 2004, considering claimant's age, education, work experience, and residual functional capacity based on the current impairments, claimant has been able to perform a significant number of jobs in the national economy.  Claimant's disability thus ended on November 1, 2004, and claimant has not become disabled again since that date.

<u>STANDARD OF REVIEW</u>

"Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards."  *Olds v. Astrue*, No. 5:09cv319/RS/EMT, 2011 WL 691595, at *1 (N.D. Fla. Jan. 19, 2011); *see also Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse

the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied.").  Substantial evidence is "'such relevant evidence as a reasonable person would accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)).  The court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the Secretary[.]" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (quoting *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

The Social Security Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  To qualify as a disability, the physical or mental impairment must be so severe that the plaintiff is not only unable to do her previous work, "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(1)(A).

Pursuant to 20 C.F.R. § 416.994, the Commissioner follows a seven-step evaluation process to determine whether the claimant continues to be disabled:

1.   The ALJ must determine whether the claimant has an impairment or combination of impairments that meets or medically equals the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  If the claimant does have such an impairment or combination of impairments, her disability continues.

2.   The ALJ must determine whether medical improvement has occurred. Medical improvement is any decrease in medical severity of the impairment(s), as

established by improvement in symptoms, signs and/or laboratory findings.   If medical improvement has occurred, the analysis proceeds to the third step.  If medical improvement has not occurred, the analysis proceeds to the fourth step.

3.  The ALJ must determine whether medical improvement is related to the ability to work.   Medical improvement is related to the ability work if the improvement results in an increase in the claimant's capacity to perform basic work activities.  If medical improvement results in an increase in the claimant's capacity to perform basic work activities, the analysis proceeds to the fifth step.

4.  The ALJ must determine if an exception to medical improvement applies. There are two groups of exceptions.  If one of the first group exceptions applies, the analysis proceeds to the next step.  If one of the second group exceptions applies, the claimant's disability ends.   If no exception applies, the claimant's disability continues.

5.   The ALJ must determine whether all the claimant's impairments in combination are severe.   If all current impairments in combination do not significantly limit the claimant's ability to do basic work activities, the claimant is no longer disabled.  If all current impairments in combination do significantly limit the claimant's ability to do basic work activities, the analysis proceeds to the next step.

6.  The ALJ must assess the claimant's residual functional capacity based on the current impairments and determine if she can perform past relevant work.  If the claimant has the capacity to perform past relevant work, her disability has ended.  If the claimant does not have the capacity to perform past relevant work, the analysis proceeds to the last step.

7.  The ALJ must determine whether other work exists that the claimant can perform, given her residual functional capacity and considering her age, education, and past work experience.  If the claimant can perform other work, she is no longer disabled.  If the claimant cannot perform other work, her disability continues.

Although the claimant generally continues to have the burden of proving disability at this final step, a limited burden of going forward with evidence shifts to the Social Security Administration.  To support a finding that the claimant is not disabled at this step, the Social Security Administration is responsible for providing evidence demonstrating that other work exists in significant numbers in the national economy that the claimant can do, given her residual functional capacity, age, education, and work experience.  *See* 20 C.F.R. § 404.1594(a) (requiring agency to show that claimant is currently able to engage in substantial gainful activity before it can find claimant no longer disabled).

<u>FACT BACKGROUND AND MEDICAL HISTORY</u>[2]

Plaintiff was born on July 24, 1975, making her 29 years of age on November 1, 2004.  T. 33.  Claimant has a high school education and is able to communicate in English. T. 33.  Alleging disability continuing from November 1, 2004, plaintiff cites a history of chronic renal failure, hearing loss, major depressive disorder, and PTSD. Doc. 18, 2.  Claimant reported past work experience as a waitress and fast food cook. T. 1250.

On January 26, 2005, plaintiff saw Dr. Mark Lehman, Ph.D., for a psychological evaluation.  Claimant complained of disturbed sleep, crying spells,

---

[2] Although intended to be thorough, and to provide an overview of claimant's history of care and treatment, this synopsis of medical evidence will be supplemented as called for in the Analysis section.

somatic concerns, fatigue, and anxiety, in addition to burning, tingling, and numbness in her feet, poor balance, fatigue, edema, and muscle spasms.  Dr. Lehman reported that plaintiff had been born with Down Syndrome[3] and sustained nerve damage in both ears.  Claimant was hospitalized with kidney failure in 1994, and again on October 23, 2002, for a kidney transplant.  Dr. Lehman diagnosed plaintiff with mood disorder (with depressive features) due to general medical condition, psychosocial stressors, and a GAF score of 55, indicating moderate difficulty in one of social, occupational, or school functioning.  T. 605-12.

From February 2, 1998, until May 31, 2006, claimant was treated at the University of Texas Medical Branch ("UTMB"), located in Galveston, Texas.  On February 12, 2004, plaintiff had a renal biopsy and was diagnosed by Dr. Kristene Gugliuzza, M.D., with renal insufficiency and history of renal transplant.  T. 784.  Dr. Philip G. Thomas, M.D., examined claimant at UTMB on April 5, 2004.   A renal ultrasound was obtained that showed mild hydronephrosis with resistive indices of 0.67 to 0.7.  T. 749.  Plaintiff returned to UTMB on May 19, 2006, when surgeons removed a nodule from the right side of her back.  Dr. Gerald A. Cambell, M.D., a pathologist, examined the excised tissue and diagnosed claimant with fibrosis.

Plaintiff was referred to Dr. Ronald A. Sinicrope, M.D., for an evaluation status post cadaveric renal transplantation.  Dr. Sinicrope, who treated claimant from

---

[3]The significance of this notation is less than clear. Characterized as "a congenital condition characterized by moderate to severe mental retardation, upward slanting eyes usually with epicanthic folds, a broad short skull, broad hands with short fingers, decreased muscle tone, and by trisomy of the human chromosome numbered 21," Medline Plus http://www.merriam-webster.com/medlineplus/down%20syndrome,  accessed via http://www.nlm.nih.gov/medlineplus/mplusdictionary.html, this would appear to be an important consideration in the disability analysis.  The medical records, however, do not develop, or even address, this potential impairment, nor does plaintiff cite it as a basis for her disability claim.

August 11, 2006, through June 26, 2007, diagnosed Ms. Zirlott with status post cadaveric renal transplantation, iatrogenic immunosuppression, status post surgical correction of birth defects of hands and feet, abdominal discomfort with gastroparesis, status post right mastoidectomy, status post left inguinal herniorrhaphy, and what he believed was tinea versicolor.  T. 1067-68.

On September 18, 2006, plaintiff called Dr. Sinicrope with complaints of chills, fever, and pain at the site of the transplant.  Dr. Sinicrope advised claimant to go to an emergency room as soon as possible.  Ten days later, plaintiff was admitted to Bay Medical Center with a temperature of 102.6 degrees, right lower quadrant pain, nausea, and vomiting.  T. 1103-19.  Dr. Scott Dean, M.D., ordered a CT urogram, which showed marked left renal atrophy, marked atrophy of the right kidney with dilation of the native right renal collecting system with presence of the right hydroureter, and proximal hydroureter of the right lower quadrant transplant kidney. T. 1118-19.  Dr. Dean discharged claimant the following day with diagnoses of transplant pyelonephritis (presenting with abdominal pain, nausea, vomiting, and fever), status post cadaveric renal transplantation, and immunosuppression.  The doctor prescribed Prednisone, Prograf, and CellCept upon discharge.  T. 1113.

On November 3, 2006, Dr. Sinicrope referred plaintiff to Dr. Sudhakar C. Reddy, M.D.  Recommending colonoscopy and endoscopy examinations, Dr. Reddy assessed plaintiff with persistent lower abdominal cramping associated with diarrhea and a history of gastroesophageal reflux disease ("GERD").  T. 1134.  Following endoscopy and colonoscopy procedures at Gulf Coast Medical Center, Dr. Reddy diagnosed claimant with mild gastritis and grade A esophagitis with small hiatal hernia.  Dr. Reddy placed plaintiff on Aciphex for her esophagus and Miralax for her

bowels.   T. 1048-52.   During a November 21, 2006, follow-up visit, Dr. Reddy diagnosed claimant with status post renal transplant, epigastric abdominal pain, mild gastritis, and diarrhea.   An ultrasound and gastric emptying study revealed marked delayed gastric emptying time.   Dr. Reddy again diagnosed status post renal transplant, as well as gastroparesis, and prescribed Reglan.   T. 1127-28, 1131.

After complaining of diarrhea, plaintiff was admitted to Bay Medical Center on August 9, 2007.   Dr. Reddy assessed claimant with a hiatal hernia, mild gastritis, and colitis in the right colon.   Plaintiff returned to Dr. Reddy for a follow-up visit on September 11, 2007, when a cytology test revealed mature squamous epithelial cells admixed with acute and chronic inflammatory cells, in addition to the presence of numerous budding yeast structures.   Dr. Reddy diagnosed self-limiting gastroenteritis and Candida esophagitis associated with immunosuppression, asking that claimant use Activia yogurt and probiotics.   T. 1121.

Plaintiff was treated at the Life Management Center of Northwest Florida from September 8, 2006, to April 7, 2008, presenting for follow-up appointments approximately once a month.   According to Dr. Brian Joseph, M.D., a psychiatrist, claimant appeared to be of "average to low average intelligence."   In October 2007, Dr. Joseph diagnosed plaintiff with depressive disorder, NOS, parent/child relationship problems, post kidney transplant, congenital hearing loss, primary support group problems, economic and occupational problems, and a GAF score between 55 and 60.   Subsequent mental examinations placed claimant's GAF score consistently in the range of 55-60, save for two occasions, in April 2007 and 2008, when she scored a 65.   On July 20, 2007, Dr. Joseph discontinued plaintiff's

Wellbutrin, placing her on Cymbalta instead.  T. 1181.  Dr. Vicki Alberts, M.D., arrived at substantially similar mental health diagnoses in April 2008.  T. 1175.

On May 2, 2008, claimant underwent an abdominal ultrasound at Bay Medical Center.  Radiologist Colin Bailey observed that the left kidney was severely atrophic and that the renal transplant ureters were mildly dilated.  T. 1171.  Plaintiff returned to Dr. Sinicrope three days later, when the doctor assessed her with status post cadaveric renal transplantation, iatrogenic immunosuppression, abdominal discomfort with gastroparesis, status post right mastoidectomy, status post left inguinal herniorrhaphy, and poor compliance.  Dr. Sinicrope recommended that claimant return in three months to recheck her renal panel, CBC, and FK level.  T. 1167-68.

Plaintiff presented at Panama City Urological Center on May 13, 2008, with pain in her ribs.  T. 1185.  Dr. Carlos Ramos, M.D., assessed her with hydronephrosis, musculoskeletal left rib cage pain, renal transplant patient, and chronic immunosuppression.  Dr. Ramos prescribed Amrix for the rib pain and discussed evaluation by pain management, in addition to management of the hydronephrosis.  T. 1187-88.  On May 29, 2008, claimant returned to Dr. Ramos for evaluation of dilation observed in the collecting system of her renal transplant.  Dr. Ramos told plaintiff to follow up in six months and repeat the renal scan.  T. 1190-92.

<u>HEARING BEFORE THE ALJ</u>

The administrative hearing commenced on May 8, 2008, with the testimony of medical expert Dr. Edward Griffin, who asserted that claimant had chronic kidney disease and focal glomular sclerosis that resulted in progression to end stage.  T. 1218.  Following a 2003 kidney transplant, plaintiff had two admissions for urinary

tract infection sepsis associated with deteriorating renal function, as measured by creatinine levels.  Dr. Griffin recalled that a biopsy performed for assessment of rejection showed mild acute tubular necrosis, and that a second such biopsy revealed moderate acute tubular necrosis.  Dr. Griffin also stated that claimant's renal function had stabilized at the time she was ceased and remained stable throughout the remainder of the record.  T. 1219.  Although noting plaintiff did not have 100 percent normal renal function with normal creatinines, Dr. Griffin observed that the deficiencies had not affected the kidney's ability to make red cell mass.  T. 1219-20.  Dr. Griffin also noted that claimant had been diagnosed with gastroparesis, defined by paralysis of the stomach and delayed gastric emptying, after she was ceased.  Though the condition caused plaintiff some nausea and vomiting when "acutely ill," Dr. Griffin did not believe the diagnosis clinically significant in the long-term.  T. 1220-21.

Citing claimant's severe bilateral hearing loss, Dr. Griffin warned that Ms. Zirlott should avoid work settings characterized by loud environmental noise.  Dr. Griffin opined that plaintiff could stand and walk one hour consecutively and four hours in an eight-hour workday, the limitation due in large part to pes planus, or flat fleet.  Dr. Griffin suggested that claimant avoid hot and humid work environments as well, in light of her renal difficulties.  T. 1222-23.

Dr. Rebecca Sweeney, a clinical psychologist, testified via telephone regarding the psychological evaluation performed on January 26, 2005, by Dr. Lehman.  Dr. Sweeney recounted that Dr. Lehman had noted some depression, as well as sleep disturbance, anhedonia, and fatigue.  Dr. Sweeney testified that Dr. Lehman had

observed alcohol dependency, but that it was in long-term remission.  Expressing general agreement with Dr. Lehman, Dr. Sweeney opined that plaintiff indeed suffered from a mental disorder related to depression or affective disorder, which was being treated with antidepressant medications.  T. 1227-28.  Dr. Sweeney, noting the April 2007 GAF score of 65, assessed mild limitations on claimant's concentration and activities of daily living ("ADL"), and moderate limitations on Ms. Zirlott's socialization capabilities.  T. 1230-31.

Plaintiff testified first about her past work experience, stating that she last worked in May 2007 as a server at Denny's.  T. 1234.  Claimant recalled that she experienced difficulty hearing diners' orders and had to leave that job after pulling a cyst in the middle of her back.  Following minor surgery to remove the cyst, plaintiff did not return to work.  T. 1235-36.  Claimant asserted that she had been at Bay Medical Center approximately ten days before the hearing, when she complained of stomach problems and pain in her ribs.  T. 1238-39.  Concerning her day-to-day activities, plaintiff testified that she lives by herself in low-income housing and spends most of her time crocheting or watching television.  Claimant asserted that she is able to shop for groceries, prepare a simple meal, and walk her dog on occasion. Plaintiff stated that she can sit for about 45 minutes before needing to rise and stretch and walk for about an hour before having to sit.  T. 1243-46.

Vocational expert Melissa Brooks concluded the hearing testimony, responding to hypothetical questions posed by the ALJ.  Brooks confirmed that she had "made specific notation of the various functional limitations noted by Doctors Griffin and Sweeney regarding limitations that the Claimant may have with respect to the

Claimant's credible physical and mental limitations."  The ALJ then asked, "Assume I adopt both of those as reasonable limitations of function as noted by both Doctors Griffin and Sweeney, would the Claimant be able to perform her past relevant work, either as she performed it or as it's customarily performed?"  Brooks ruled out prior work experience, but nonetheless identified jobs claimant could perform with the recited limitations, including ticket taker, cashier II, and office helper in the "light" category, in addition to food and beverage order clerk, paramutual ticket checker, and addresser in the "sedentary" category.  T. 1251-52.

## ANALYSIS

Plaintiff raises only one issue in this appeal, arguing that the ALJ erred by determining that her renal condition had medically improved as of November 1, 2004. Doc. 18, 14.  She contends that the foregoing determination is not supported by the objective medical evidence, and focuses on the ALJ's alleged failure to address the treating sources' records and opinions, all of which have been laid out above.  In her conclusion, plaintiff requests that her case be remanded with instructions to evaluate the evidence of mental impairment and to determine if an IQ examination is necessary to determine whether she can return to substantial gainful activity, but no argument has been advanced as to this demand.  Doc. 18, 16-18.

"There is a statutory requirement that, if [a claimant is] entitled to disability benefits, [her] continued entitlement to such benefits must be reviewed periodically." 20 C.F.R. § 404.1594(a); *see also* 20 C.F.R. § 416.994(a).  The agency "must determine if there has been any medical improvement in [the claimant's] impairment(s) and, if so, whether this medical improvement is related to [her] ability

to work." 20 C.F.R. § 404.1594(a). If the claimant has experienced medical improvement related to the ability to work, the agency must determine whether the claimant can engage in substantial gainful activity. *See id.* A claimant who can engage in substantial gainful activity is no longer disabled. *See id.* ("Even where medical improvement related to [the claimant's] ability to work has occurred or an exception applies, in most cases . . . [the agency] must also show that [the claimant is] currently able to engage in substantial gainful activity before [it] can find that [the claimant is] no longer disabled.").

When finding plaintiff disabled in May 2002, ALJ Raines determined that Ms. Zirlott's renal failure met the listing at section 6.02B of 20 C.F.R. Part 404, Subpart P, Appendix 1 (providing that a claimant who has received a kidney transplant is disabled for the 12 months following surgery, because of the increased likelihood of organ rejection and recurrent infection during that time). T. 51. Medical improvement is possible, based on degree of kidney function, after the first year. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, § 6.00E2. In determining the degree of kidney function, the agency will consider the occurrence of rejection episodes, the side effects of immunosuppressants, the frequency of any renal infections, the presence of systemic complications such as other infections, neuropathy, or deterioration of other organ systems, renal osteodystrophy, persistent motor neuropathy, and nephrotic syndrome. *See id.* The absence of symptoms, signs, and laboratory findings can indicate medical improvement. *See id.*

After considering the entire record, the ALJ in this case found that claimant's renal condition had medically improved as of November 1, 2004, and that the

improvement was related to the ability to work.  T. 27.  The medical evidence shows that plaintiff was admitted for elevated creatinine in February 2004.[4]  Dr. Gugliuzza ordered a work-up for renal insufficiency, including a biopsy and kidney ultrasound. The ultrasound returned normal and the biopsy revealed no evidence of acute rejection.  Her creatinine stable, claimant was discharged.  T. 783-84.  UTMB treatment records dated July 2004 show creatinine within the normal range at 1.2 and a hematocrit level in the mid-30s.  The staff physician assessed renal function as stable.  T. 746.  On November 5, 2004, plaintiff again registered creatinine within the normal range at 1.1, and a hematocrit level in the high-30s.  Renal function was described as "excellent" at this time.  T. 740.  These data tend to indicate medical improvement in the months directly preceding the ALJ's adverse determination.

I also find the testimony of Dr. Griffin informative for purposes of this analysis.  Based on his review of the record, Dr. Griffin stated that claimant's renal function remained "remarkably" stable after November 1, 2004.  Despite some mild renal insufficiency, Dr. Griffin observed that kidney function was sufficient to maintain normal red cell mass and stable creatinine levels for more than three-and-a-half years.  Dr. Griffin ultimately concluded that plaintiff did not meet or equal a listed impairment, and that Ms. Zirlott could perform a range of light work.  T. 1219-24.  Dr. Griffin's observations are substantially confirmed by claimant's most recent visit to Dr. Sinicrope, who remarked in early May 2008 that "Ms. Zirlott has been doing well from the renal transplant standpoint."  More specifically, Dr. Sinicrope

---

[4] As a point of reference, I note the testimony of Dr. Griffin, who explained that creatinine ranging from 1.0 to 1.3 and hematocrit levels in the mid- to high-30s are indicators of renal stabilization.  T. 1219.

noted that plaintiff's most current recorded creatinine level had been 1.3 (in December 2007) and that her labs, urinalysis, and CBC all looked "fine." T. 1167. As the ALJ concluded, the medical evidence supports a finding that, as of November 1, 2004, claimant experienced a decrease in medical severity of the impairments present at the time of the CPD.

Plaintiff argues otherwise, citing the ALJ's alleged failure to consider certain evidence. In particular, claimant contends the ALJ did not consider her September 2006 hospitalization for abdominal pain, nausea, vomiting, fever, or the treatment notes of Dr. Reddy. Further, plaintiff argues the ALJ misrepresented the record regarding her May 2008 hospitalization, because the ALJ failed to account for an abdominal ultrasound showing severe native kidney atrophy with severe hydronephrosis. Doc. 18, 15-18.

I note that a thorough review of claimant's brief reveals little in the way of legal authority such as might demonstrate that she has identified an error requiring reversal of the ALJ's decision as to the finding of medical improvement. In an abundance of caution, however, I address plaintiff's contentions in turn. When claimant was hospitalized for abdominal pain and nausea on September 28, 2006, a chest x-ray was clear, a urine culture returned negative, and Ms. Zirlott's creatinine and hematocrit levels were 1.2 and 35, respectively, or within the normal range as defined by Dr. Griffin. T. 1113-15, 1219. In other words, plaintiff's labs at the time of this hospitalization compare favorably with those considered at other junctures of the administrative decision. Claimant's nausea and vomiting, moreover, were not of great concern to Dr. Griffin, who opined that such symptoms associated with

gastroparesis occurred only during periods of acute illness and were not "clinically significant." T. 1219-20. "'[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision . . .' so long as the decision is sufficient to allow this Court to conclude that the ALJ considered the claimant's medical condition as a whole." *Gordon v. Astrue*, 249 F. App'x 810, 812 (11th Cir. 2007) (quoting *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005)). Because the ALJ indeed considered plaintiff's medical condition in its entirety, the failure to reference the foregoing hospital stay does not undermine the validity of the administrative decision. *See id.*

I recognize the ALJ's failure to recount in full detail the medical evidence generated by claimant's May 2, 2008, hospitalization, which revealed severe native kidney atrophy with severe right hydronephrosis. T. 1171. In contrast, the ALJ in his decision merely recalled of this episode that "[x]-rays of [claimant's] chest were unremarkable and the lab work was normal." T. 28. Though the omitted evidence might suggest a finding other than the one reached by the ALJ concerning plaintiff's medical improvement, the ALJ's characterization is consistent with the summary offered by Ms. Zirlott's treating physician, Dr. Sinicrope, who remarked that her labs, CBC, and urinalysis were all "fine." More important is Dr. Sinicrope's ultimate conclusion at the time, which was that "Ms. Zirlott has been doing well from the renal transplant standpoint." T. 1167. "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996). Assuming arguendo the results from claimant's May 2008 hospitalization auger in favor of disability, the mere

existence of such contrary evidence does not allow this court to reverse the Commissioner's decision where, as here, the decision is supported by substantial evidence.  *See id.*

Plaintiff argues next that the ALJ failed to consider Dr. Reddy's treatment notes.   Doc. 18, 16-17.   First, I observe that on at least two occasions the administrative decision cites to Dr. Reddy's notes, indicating the ALJ did in fact consider that medical source.  T. 28, 30.  Further, the treatment notes at issue prove consistent with evidence from other medical sources relied upon by the ALJ.  For example, Dr. Reddy reported that despite complaints of nausea, vomiting, and a history of gastroparesis, claimant's abdomen was soft and her bowel sounds active; Dr. Reddy observed neither edema in the extremities nor acute distress.  T. 1126, 1131, 1133.   Similarly, Dr. Sinicrope recorded in a treatment note cited in the Commissioner's decision that plaintiff was being evaluated by a gastroenterologist for continuing abdominal discomfort.  Dr. Sinicrope, likewise, noted that claimant's abdomen was soft, benign, mostly non-tender, and exhibited no guarding or rebound.  T. 1077.  In other treatment notes cited in the ALJ's written decision, Dr. Sinicrope made like observations.  T. 28, 30.   In June 2007, Dr. Sinicrope observed no extremity edema and reported that plaintiff's abdomen was soft and benign.  T. 1067.  In August 2006, Dr. Sinicrope wrote that claimant exhibited no guarding, rebound, tenderness, or extremity edema; again the abdomen was soft and bowl sounds active.  T. 1101.

Dr. Griffin also recognized plaintiff's gastroenterological difficulties, opining nonetheless that Ms. Zirlott's conditions would not prevent her from performing a

range of light work.  T. 1217-24.  Significantly, the ALJ placed "greater weight" on the opinion offered by Dr. Griffin in determining claimant's residual functional capacity.  T. 31.  The ALJ need not comment or pass judgment upon every scintilla of medical evidence before her.  *See Gordon*, 249 F. App'x at 812.  Instead, the ALJ must consider the claimant's medical condition as a whole.  *See id.*  To the extent the ALJ declined to credit some of Dr. Reddy's treatment notes, the content of such notes was replicated in medical sources expressly referenced in the ALJ's decision.

Plaintiff also contends the ALJ did not adequately address the opinion of Dr. Lehman, whom she believes concluded that Ms. Zirlott "cannot stand or walk for extended periods of time."  T. 606.  Contrary to claimant's contention, the statement under consideration is not a medical source opinion.  Rather, Dr. Lehman prefaced this statement, as well as a number of others, with the qualifier that plaintiff had been the primary informant for the background information to follow.  T. 606.  So qualified, this statement appears to be little more than an expression of claimant's subjective medical complaints.  The other evidence of record, moreover, suggests plaintiff can stand and walk without difficulty.  Claimant testified that she is able to shop for groceries, prepare a simple meal, and walk her dog, stating very specifically that she can "walk at least an hour" before having to sit.  T. 1244-46.  None of plaintiff's treating sources observed that Ms. Zirlott has trouble standing or walking.  In short, the subject statement is neither a medical source opinion nor supported by the evidence of record.

Finally, claimant argues that the matter must be remanded to allow for IQ testing and to "properly evaluate the evidence of a mental impairment."  Doc. 18, 18.

I note at the onset that plaintiff offers no factual or legal argument in support of this bare request.  Because plaintiff's failure to develop the factual or legal grounds for this claim forecloses upon all but the most cursory review of the issue, I find that the point is waived.  *Cf. Outlaw v. Barnhart*, 197 Fed. App'x 825, 828 n.3 (11th Cir. 2006) (holding claimant waived claim raised in the statement of issues "because he did not elaborate on this claim or provide citation to authority about this claim"); *Cheffer v. Reno*, 55 F.3d 1517, 1519 n.1 (11th Cir. 1995) (holding appellants "abandoned" claim listed in statement of issues for failure to further address the issue in their brief).

Though the law does not require this court to recognize an allegation so casually supported, I nevertheless note that the claim is also unsubstantiated on the merits.  A claimant will be found disabled due to mental retardation if, among other things, she exhibits deficits in adaptive functioning manifesting prior to age 22, "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function [.]"  *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05C.  Here, none of claimant's mental health practitioners arrived at a diagnosis of mental retardation, which, if found, should have featured prominently in the medical records.  T. 600-01, 610, 1175, 1178, 1181.  Dr. Victor Fermo, Jr., M.D., noted that plaintiff received As and Bs in high school, and Dr. Joseph observed that she enrolled in special resource classes only due to her hearing difficulties rather than any cognitive deficiencies.  T. 599, 1154.  Dr. Fermo estimated claimant's intelligence as "average," and Dr. Joseph stated that Ms. Zirlott "appears to be of average to low average intelligence."  T. 599,

1155.  That plaintiff maintained employment before and after the kidney transplant is also significant, because "'a person's IQ is presumed to remain stable over time in the absence of any evidence of a change in a claimant's intellectual functioning.'" *See Hodges v. Barnhart*, 276 F.3d 1265, 1268-69 (11th Cir. 2001) (quoting *Muncy v. Apfel*, 247 F.3d 728, 734 (8th  Cir. 2001)).

With the exception of Dr. Lehman's report indicating that claimant was born with Down Syndrome—a characterization unsubstantiated elsewhere in the record—Ms. Zirlott points to no evidence tending to establish that she is intellectually incapable of substantial gainful activity.  Conversely, the record discloses that a genetic screening performed in connection with plaintiff's pregnancy on November 29, 1995, returned negative for Down Syndrome.  T. 420.  In the absence of any persuasive argument, much less of any such proof, I can discern no rationale to remand this matter for further determinations on IQ or mental impairment.

In sum, assuming the ALJ mischaracterized or discounted certain parts of the record, such deficiencies do not refute the ultimate finding of medical improvement, based on stabilization of renal function.  Although plaintiff has other medical issues, she does not explain how the existence of these issues undermines the ALJ's findings.  The most recent medical evidence tends to show that claimant's condition, even four years after her disability ceased, has not worsened to any discernable degree.  I find the ALJ conducted a thorough examination of the record and properly considered plaintiff's medical condition as a whole to reach a determination supported by substantial evidence.  This court may not reverse the Commissioner's decision under such circumstances.  *See Carnes*, 936 F.2d at 1218 ("[T]his Court may reverse the

decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied.").

Accordingly, it is respectfully RECOMMENDED:

The applications for supplemental security income and disability insurance benefits be DENIED.

At Pensacola, Florida, this 29th day of August, 2011.


*/s/ Charles J. Kahn, Jr.*
**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**




NOTICE TO THE PARTIES

Any objections to these proposed findings and recommendations must be filed within fourteen days after being served a copy hereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of any objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; *United States v. Roberts,* 858 F.2d 698, 701 (11th Cir. 1988).